## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **LASHANNA R. FORD, an individual,** | ) | |
| **TOMMY HALL JR., an individual,** | ) | |
| **CABRENA MIMS, an individual, and** | ) | |
| **DORIS WILLIAMS, an individual,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 03-CV-0575-TCK-SAJ** |
| | ) | |
| **AMERICAN AIRLINES, INC., a** | ) | |
| **Delaware Corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Now before the Court are the Motion for Summary Judgment Against Plaintiff Hall (Dkt. # 27), the Motion for Summary Judgment Against Plaintiff Mims (Dkt. # 28), the Motion for Summary Judgment Against Plaintiff Ford (Dkt. # 29), and the Motion for Summary Judgment Against Plaintiff Williams (Dkt. # 30). Plaintiffs LaShanna R. Ford ("Ford"), Tommy Hall, Jr. ("Hall"), Cabrena Mims ("Mims"), and Doris Williams ("Williams") filed this action seeking declaratory and injunctive relief, compensatory and equitable damages, liquidated damages, punitive damages, costs and attorney fees for alleged violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), and the laws of the state of Oklahoma. In particular, plaintiffs allege that their employer, American Airlines, Inc. ("American") discriminated against them and subjected them to a hostile work environment on the basis of their race, African-American; their state law claim is for intentional infliction of emotional distress.[1]

---

[1] Plaintiffs have abandoned claims for retaliation and unlawful termination in violation of Oklahoma policy. Plaintiff Hall has also abandoned his claim for intentional infliction of emotional distress.

## I.

The parties have stipulated that all of the plaintiffs are, or were, "employees" of American as defined by state and federal law and by Title VII, in particular.  Plaintiffs are all African-Americans and therefore, members of a "protected class" as defined by Title VII.  At all times relevant hereto, plaintiffs were aware that American has written policies against unlawful harassment, including harassment based on race.

### A.    The Collective Bargaining Agreement

Plaintiffs are or were  members of the Transport Workers Union of America, AFL-CIO ("TWU).  Accordingly, their employment with American is governed by the Collective Bargaining Agreement ("CBA") between American and the union.  During all times relevant to the instant action, the CBA, titled "Agreement between American Airlines and Transport Workers Union of America, AFL-CIO covering Aviation Maintenance Technicians, Plant Maintenance and Ground Service Employees of American Airlines, Inc.," dated March 1, 2001, governed plaintiffs' employment with American.  Agreement, attached as App. Tab B, Ex. 1 to Motion for Summary Judgment Against Plaintiff Hall (hereinafter "Hall MSJ"), Dkt. # 27; Motion for Summary Judgment Against Plaintiff Mims (hereinafter "Mims MSJ"), Dkt. # 28; Motion for Summary Judgment Against Plaintiff Ford (hereinafter "Ford MSJ"), Dkt # 29; and Motion for Summary Judgment Against Plaintiff Williams (hereinafter "Williams MSJ"), Dkt. # 30.

The CBA governs the "rates of pay, rules, and working conditions" of all employees covered by the agreement.  The agreement also contains specific provisions governing employees' hours of work, classifications and qualifications of particular positions, compensation for attendance at training classes, and length of meal periods.  As outlined in Article 31 of the CBA, there are specific

grievance procedures that employees must follow if they believe their rights under the agreement have been violated.  Hall has used these procedures in the context of allegations made after the time period relevant to the instant law suit.  Williams has used them in the context of complaints made before the time period relevant to the instant case.  American does not allege whether Ford or Mims have used the procedures.

The CBA describes the job of an Overhaul Shop Mechanic ("OSM") as an employee who "[p]erforms work in operations such as, but not limited to:  shot peening, disassembling, checking and cleaning, repairing, replacing, testing, adjusting, assembling, installing, servicing and fabricating, required to maintain aircraft components."  Id. at 54.  The CBA sets out the "Classification Description" of a crew chief as someone who assists with periodic evaluation of operational requirements and performance, operational planning, and scheduling, evaluation of training methods and techniques, and performance appraisal of employees.  Id. at 49.  Plaintiffs contend that such duties could be considered management responsibilities and they imply that certain crew chiefs may have performed some duties that were reserved to management.  American asserts that a crew chief is a union contract employee in a non-management position, as a crew chief does not have the authority to hire, fire, promote, or discipline an American employee.  The crew chief reports to the same supervisor as the rest of the employees in the shop.

**B.     Ford and Hall**

Plaintiff Ford began her career with American on April 6, 1998.  From March 2002 to May 2003, Ford worked as an OSM in the Wheel and Brake Shop (the "Shop").  Thereafter, due to a reduction in force, Ford exercised her seniority rights and moved to a position at the Alliance Fort

Worth Maintenance Base. Ford never voluntarily left her job at American, nor has she applied for another position in order to leave American.

Plaintiff Hall began his employment with American as a building cleaner on March 16, 1998, and began working as an OSM in the Shop on October 17, 1998. In May 2003, Hall was laid off from American during the reduction in force. The events giving rise to Hall's allegations occurred in the Shop between April 2002 and October 2002, when Hall worked with Ford. The events giving rise to Ford's allegations also occurred in the Shop. Both plaintiffs mainly worked in the "build-up" area of the Shop, where they built aircraft wheels. They were normally assigned to build wheels on the 767 line.

At their union steward's suggestion, Ford and Hall took notes regarding events occurring in the Shop between March and August, 2002. Plaintiffs contend that union stewards instructed Ford and Hall to take notes to document the incidents of racial discrimination Ford and Hall claim to have experienced in the Shop. Jim Seagroves was the crew chief in the Shop during the relevant time period. Carl Black was the supervisor in the Shop during the day shift and Mike Landry was the supervisor during the afternoon shift, although they would occasionally rotate shifts.

While Ford and Hall were employed in the Shop, they were criticized for their work performance. Crew Chief Seagroves told them, "You two are a poor excuse for OSMs, your work performance is poor and inconsistent compared to the others on the build up table, you all build less wheels than anyone else. One day you come in and build ten wheels and the next you may just do five or six,. If everyone else can build consistently, you should be able to too." Ford MSJ, Dkt. # 29, Tab A (Ford Depo). at 95:3-6; Hall MSJ, Dkt. # 27, Tab A (Hall Depo.), 84:24-25; see Resp. Br., Dkt. # 69, App. Ex. H (Notes by Ford), at Bates No. AA 0236. Plaintiffs contend that this

4

occurred after Hall questioned Seagrove's demand that Hall "sign off" on wheels Hall did not mount.

Ford alleged that Supervisor Landry also harassed her and plaintiff Hall when Landry told them that they were not doing enough work and were not producing enough. Ford contends that Landry scrutinized her work and threatened to put her "in the back" whereas he did not do so with white employees. Ford admitted that Landry never made a racial slur against her, nor did he call her names, curse at her or make any racial comments about her or any of her co-workers. Nonetheless, she claims that his mannerisms, attitude, and the way he treated employees caused her to believe that he was a racist. Hall testified that he was never physically harassed, never subjected to offensive posters or cartoons, never written up, never given an "advisory," never called into a disciplinary meeting, never docked any pay, never denied any shift changes, and never called any names.

Nonetheless, Ford and Hall allege that Landry discriminated against them when he sent co-employee Mike Miller, a Caucasian male who was known to be a hard worker and to produce between 15 and 20 wheels a day, to work with them. Ford testified that it was discriminatory for Landry to send Miller to help them if Landry's decision was motivated by a desire to challenge plaintiffs to do more work. Hall testified that it was unfair to compare his production, and Ford's production, to that of Miller, who worked through break periods.

Ford specifically alleges that it is discriminatory to compare her work to another African American employee's or to another white employee's work. Ford testified that she "[doesn't] think a supervisor should set up and compare your work to any other individual . . . and tell you that you're not up to your expectations." Ford MSJ, Dkt. # 29, App. Tab A (Ford Depo.) at 121:2-7, 11-13. Ford claimed that "if they went according to the FAA and the ESO regulations, half of the work

5

that we produce, if we went according to the ESO, we wouldn't put out that much work."[2] Id. at 121:15-18.  Similarly, Hall does not think his work production should be compared with that of other OSMs.  He testified, "You can compare me to nobody else.  I'm my own man."  Hall MSJ, Dkt. # 27, Tab A (Hall Depo.), at 110:3-6.

Hall maintained that he produced as many wheels as possible following FAA regulations, and that he was more concerned with quality than quantity.  At Hall's deposition, he was asked if he told a Human Resources investigator that the conflict in the Shop might be because he and Ford did not produce as much as others.  He responded:  "I can't recall it, but it's possible because that seemed like that's why was always got picked on because we wasn't performing as well as another guy that was next to us."  Hall MSJ, Dkt. # 27, App. Tab A (Hall Depo.) at 188:8-14.  Hall testified that there were no other demands made on him other than requests for increased productivity.

Ford and Hall allege that Landry's monitoring and direction of their work production, like his criticism of their performance, constituted discrimination and harassment.  Specifically, Landry monitored their work production by observing them while they worked and by counting their brake keys to ascertain how many wheels they were able to build in a day.  Hall testified that he was "verbally harassed" by Supervisor Landry when Landry told Hall and Ford that he needed ten to thirteen 767 wheels "bad and that we needed to get them out,"Hall MSJ, Dkt. # 27, App. Tab A (Hall Depo.), at 108:16-17.  Yet, when Hall and Ford worked through their break and part of lunch to meet Landry's demand, the wheels were not shipped out when Landry said they were needed for shipment.

_____

[2]      Neither party states the terms abbreviated by "FAA" and "ESO."  The Court assumes "FAA" stands for "Federal Aviation Administration" and "ESO" stands for "Engineering Specification Order."

At the end of break periods and at the beginning of shifts, the supervisor on duty would generally tell the employees that it was almost time to go to work.  Like other employees, Ford and Hall would often play dominoes during break periods.  Ford and Hall played with a group that consisted of other African-American employees as well as one white employee.  Their domino table, which was not assigned to them, was located in close proximity to and within the direct line of sight of the supervisor's office.  Because of the location of their table, when the supervisor told employees to go back to work, the first table he approached was the table where Ford and Hall sat, and other employees were able to "hide" from the supervisor due to the location of their tables.  Ford and Hall allege that this was discriminatory because the black employees were told to go back to work while the white employees at other tables were permitted to continue their games.

On one occasion, Hall asked Supervisor Black why he had not told the Caucasian employees to go back to work yet.  According to Ford, Black responded by stating "Well, I like coming telling you all to go to work first."  Ford MSJ, Dkt. # 29, App. Tab A (Ford Depo.) at 81:17-18.  Ford alleges that this response constitutes a racial slur and a comment of discrimination, as "you all" referred to the black employees.  Black also followed them to the tool room whereas he did not follow white employees to the tool room after the break.  Ford and Hall claim that Black would sometimes sit with the Caucasian employees at other tables after telling the African-Americans to go back to work.

Ford also claims American discriminated against her when she was assigned to work on the main wheels of the aircraft while white female employees were assigned to work on the nose wheels, which were lighter.  When Ford complained about these work assignments, changes were made so that white females worked on heavier wheels and Ford worked on the nose wheels, at least for one

7

week.  After three weeks, Ford was moved from the nose wheel line, purportedly because there was not enough work on this line.  Ford testified that American also discriminated against her because she was sometimes asked to help in the "tear down" area of the Shop when that area was shorthanded, whereas only one white female was moved to the tear down area.

Hall alleges that he was given"unequal assignments" because other employees who finished their work were permitted to "sit around and chit-chat and do whatever they want, but the minute we got done with our assignment, we always had to find something else to do."  Hall MSJ, Tab A (Hall Depo.) at 147:19 - 148:1. He also claims that he was forced to work under "unbearable working conditions" because it was hot due to a lack of air-conditioning in the back of the area, and whenever he was told he was not being productive, he was threatened with being assigned to work in that area.  Id. at 166:11 - 167:6.

Ford and Hall claim that they suffered from discriminatory treatment when the employees on the next shift did not mount the wheels that they built, whereas the next shift mounted the wheels built by others.  Ford and Hall further maintain that supervisor Landry discriminated against them when, after they complained to him about this, Landry said "don't worry about what they do, you all just do what you're supposed to do." Ford MSJ, Dkt. # 29,  App. Tab A (Ford Depo.), at 112:20-21; see Hall MSJ, Dkt. # 27, App. Tab A (Hall Depo.), at 118:1-10.

 Plaintiffs Ford and Hall called their division personnel manager, Ed Cheverest, and complained that an African American female had been assigned to mount wheels, which was a heavy job.  After calling Cheverest, the African American female was moved and a white female and African American male were moved to mounting.

8

Plaintiffs Ford and Hall also called the "Network Hotline" on June 7, 2002, to report allegations of discrimination in the Shop.  As a result of this phone call, Human Resources Investigator Bob Trimble began investigating their allegations of discrimination.  Investigator Trimble concluded that there was no evidence to support racial discrimination.  Rather, Trimble found that the evidence suggested "that this is more a question of perceptions of productivity; in other words, do the supervisors and employees agree as to whether or not sufficient work has been conducted and how that information has been communicated." Ford MSJ, Dkt. # 29, App. Tab H (Trimble Memo to Ed Cheverest).  Plaintiffs allege that Trimble did not talk with witnesses who worked with or had personal knowledge of their working situation and therefore, Trimble did not conduct a complete investigation into their complaints of discrimination.

Ford's claim of severe emotional distress is premised on her contention that she contacted her union representatives and had an "emotional spell," "called my legal [sic] crying," and had "emotional stress." Id., App. Tab A (Ford Depo.) at 225:2-18.  Ford testified that her stress started when she began taking notes to document the incidents of alleged discrimination she was experiencing.  She had her first and only anxiety attack on December 2, 2002, and was thereafter prescribed an anti-anxiety drug.  In response to the question, "Now, who if anybody, do you believe intentionally tried to cause you severe emotional stress?" Ford stated, "I don't think it was intentionally done by anyone, not intentional. Id. at 228:17-21.  Ford testified that she did not seek counseling during the course of the events described herein.  She did not go to a psychologist, a psychiatrist, a minister, or any other counseling services.  Hall does not have a claim for intentional infliction of emotional distress against American.

C.    **Mims and Williams**

Plaintiff Mims began working for American in April 2000 as a building cleaner.  After seven months, Mims became an aircraft cleaner and remained in this position for nine and a half months before she became an OSM and worked in the Shop.  Williams also began working for American in April 2000, as a building cleaner, and became an aircraft cleaner for eight to nine months before being transferred to the Shop where she worked as an OSM for a year and a half.  Pursuant to the CBA, Mims and Williams had recall rights to return to a position at American if they were laid off and the work force at American was thereafter increased.  Williams was laid off after September 11, 2001, and Mims was laid off in October 2001.  Both returned to work under their recall rights in April 2002.

Williams' complaints of discrimination relate to the time she was in Dock 1B – not in the Shop.  The events giving rise to Mims' allegations occurred in Dock 1B *and* the Shop.  However, Mims claims that she was the victim of discriminatory acts in other areas of employment at American and that she witnessed problems in the Shop.  Williams also claims that she suffered acts of discrimination during other job assignments at American.

When Mims and Williams returned to work, they were assigned to Dock 1B as painters and remained there until the summer of 2002.   The painter position fell within the job classification of OSM for salary purposes.  Mims and Williams worked together in Dock 1B.  Among their supervisors were Tim Wright and Scott Hinson.  Their crew chief was Richard Misenhelter, who was nicknamed "Smoothie."

Mims and Williams testified that crew chief Misenhelter was the only individual to discriminate against them in Dock 1B.  They claim that, on the first day they worked in Dock 1B,

10

Misenhelter discriminated against them when he told them, "It's hard work, ladies, and I know you probably won't be here for long anyway." Mims MSJ, Dkt. # 28, App. Tab A (Mims Depo.) at 96:22-23; see Williams MSJ, Dkt. # 30, App. Tab A (Williams Depo.) at 52:6-7.  Williams testified that Misenhelter also said they "probably [would not] need a locker" because they would not be in Dock 1B long.  Williams MSJ, Dkt. # 30, App. Tab A (Williams Depo.) at 53:9-11.  Williams and Mims claim that American discriminated against them because it took 45 days for them to receive a locker.  However, Mims testified that all of the other lockers were taken when she and Williams first started at Dock 1B and an additional locker had to be brought in for them.  After her first affidavit and deposition, Mims affied that she and Williams noticed vacant lockers in another area, approached the supervisor in that area, and obtained lockers themselves to bring to their work areas for their personal use.

Mims and Williams also claim that Misenhelter discriminated against them when he made them go straight to work after "clocking in" and did not require this of other employees.  Mims testified that Misenhelter allowed "the other guys" to sit around and visit for 30 to 45 minutes after they clocked in. Mims Depo. at 58:3-10.  Mims testified that Misenhelter told her the male employees knew what they were doing and could do their jobs faster.  Likewise, Williams testified that Misenhelter told her and Mims that the two employees who were supposed to be training them had been there long enough that they could clock in and visit "because they know what they are doing."  Williams MSJ, Dkt. #30, App. Tab. A (Williams Depo.) at 54:4.

Mims and Williams testified that Misenhelter discriminated against them by timing them when they took breaks and retrieved tools from the tool crib.  Mims explained that following an employee around and criticizing every aspect of his or her job performance is known as

"birddogging."  Resp. Br., Dkt. # 69, App. Tab C (Mims Depo.) at 148:16 - 149:22.  According to Mims and Williams, Misenhelter only "birddogged" them and not their white male coworkers. Williams testified that, although Misenhelter monitored her break periods, he allowed her to take the full amount of her break time, except for an instance where she went to a break late and he required her to return to work at the end of the normal break time.  He also allowed her to take her full lunch break.

Williams alleged that Misenhelter discriminated against her and Mims in the way he spoke to them and in his body language.  For example, Mims and Williams both testified that Misenhelter called each of them "girly" rather than call them by their names.  Mims MSJ, Dkt. # 28, App. Tab A (Mims Depo.) at 39:13-15; Williams MSJ, Dkt. # 30, App. Tab A (Williams Depo.) at 54:16-18. Mims first name was on her work shirt, and she requested that he call her by her name.  Instead of calling her "Cabrena," however, he began calling her "Cassandra."  After her deposition, she affied that he called Caucasian employees by their given names.

Mims also claims that she was "verbally harassed" when Misenhelter told her, "Girly, you need to get back to work, you need to sand this plane better than what you're doing.  You're missing spots, you need to go back over it."  Mims MSJ, Dkt. # 28, App. Tab A (Mims Depo.) at 69:15-18. Similarly, Williams claims that she was subject to discrimination through verbal criticism. Specifically, she testified that, in front of their coworkers,  Misenhelter told her and Mims they were doing a poor job and he wanted them to redo it, no matter how long it took.  Williams MSJ, Dkt. # 30, App. Tab A (Williams Depo.) at 110:23 - 112:2.

Mims admitted that she made mistakes when she first started in Dock 1B and that it was fair to criticize her painting and sanding, at least at the beginning of her time there.  Mims and Williams

both claim that Misenhelter was responsible for training his crew but that he never trained them in the fundamental aspects of their jobs in Dock 1B.  They assert that his refusal to train them was a violation of his responsibilities under the CBA.

Mims and Williams claim that, after complaining to Misenhelter that they were not properly trained, he gave them a thick book, pointed at an airplane, and told them "look at the book and then come back and tell [him] what we've learned . . . ."  Mims MSJ, Dkt. # 28, App. Tab A (Mims Depo.) at 58:10-23; see Williams MSJ, Dkt. # 30, App. Tab A (Williams Depo.) at 66:14-22; 100:7-11.  Mims also claims she was given unequal access to training because she was never trained to operate a lift so as to get close enough to an airplane without damage to the airplane.  She claims that a coworker or a crew chief is supposed to be in the lift with a trainee, but Misenhelter refused to get into the lift with her.  Mims does not know if Misenhelter got in the lift to train her white coworkers, but stated "I'm pretty sure they probably were trained, they had been there five years."  Mims MSJ, Dkt. # 28, App. Tab A (Mims Depo.) at 147:15-17.

Williams alleges that she was given unequal assignments because some of the jobs, like sanding the edge of the wing and painting the underside of a plane, were dangerous and difficult.  She stated "I know it was part of our job . . . ." and testified that she wore a safety device.  Williams MSJ, Dkt. # 30, App. Tab A (Williams Depo.) at 100:1-15; 103:18-21; 104:3-6.  She explained that, while some jobs were inherently dangerous, she was directed to perform difficult jobs for which she was not trained while her coworkers/trainers, who were much more experienced, were doing the easy jobs.

Williams specifically testified that Misenhelter discriminated against when he asked her to climb on an airplane to repaint a small area.  She initially testified that when she told him the plane

13

was moving, he purportedly said, "I don't care, [it's] done incorrectly, get up there and paint it." Williams MSJ, Dkt. # 30, App. Tab A (Williams Depo.) at 102:2-3.  She testified that she had to ask the mechanics to stop the plane for her to repaint the area, and they did so.  Later, she testified that, at Misenhelter's request, she had climbed on the plane to repaint it before it was moved, but, as it was moving, "somebody had to yell and tell – I think CaBrena or somebody told them I was up there . . . ." before it was stopped.  Id. at 104:16-18.

Similarly, Mims testified that American discriminated against her when Misenhelter instructed her to wear a harness and climb on an airplane in order to paint it.  Mims alleges that Misenhelter knew the airplane was about to moved and that Misenhelter and other Caucasian workers pointed and laughed at her and Williams during the incident.  Some mechanics noticed them on the airplane, immediately had the airplane stopped, and criticized Misenhelter for his actions. Mims testified that the airplane moved about a foot before it was stopped.

Mims testified that she reported Misenhelter's actions to all four of the supervisors she had while working in Dock 1B, to the union representative, and to Jack Wing, who worked in human resources at American.  The supervisors called Misenhelter into his office and talked to him. According to Mims, each time she reported Misenhelter's actions and a supervisor met with him, his alleged discriminatory actions toward her became worse.  Similarly, Williams testified that she complained to supervisors Wright and Henson about Misenhelter's behavior, but they laughed at her complaint and stated, "he's just like this."  Williams MSJ, Dkt. # 30, App. Tab A (Williams Depo.) at 41:18-22.  She also contends that Misenhelter's conduct toward her became worse after she complained.

Wing admitted that he interviewed only three people after receiving written complaints of discrimination from Williams and Mims – their manager, supervisor, and crew chief – the three people they accused of discriminatory acts. Wing did not interview any coworkers or witnesses to the acts of which they complained.  After a delay and several requests from Mims and Williams, Wing produced a letter in January 2003 stating that he found no evidence of racial discrimination. Mims and Williams felt that Wing had "swept [the matter] under the rug because he was talking about retiring in April . . . ."  Resp. Br., Dkt. # 69, App. Tab C (Mims Depo.) at 79:2-3; see id., App Tab D (Williams Depo.), at 90:4-14.

Williams requested a transfer from Dock 1B, and was transferred into the Shop in July 8, 2002.  Mims put in four bids to transfer from Dock 1B.  Misenhelter told her she was wasting her time requesting transfers, and Mims alleges that Misenhelter made a "racial slur" to her when he said "the only way that [she] would get out of his shop, leave his shop, was to leave American Airlines." Mims MSJ, Dkt. # 28, App. Tab A (Mims Depo.) at 71:16-24.  Mims was finally approved for a transfer to the Shop shortly before Dock 1B was closed and its functions transferred to other locations.  In the Shop, Mims worked as a parts washer.  Her job was to put the wheels on a conveyer belt so that they could be cleaned.

Mims testified that crew chief Randall Strickler discriminated against her when, after she turned off her line to go to the bathroom, Strickler sent Williams into the bathroom to get her, turned her line back on, and told the union steward to whom she reported the incident that she was being insubordinate.  Mims had reported the incident by calling the "1-800 number," but, when Strickler suggested she call back to say that "everything was okay," she did so.  Mims MSJ, Dkt. # 28, App.

Tab A (Mims Depo.) at 44:15 - 47:6. Mims testified that, even after the incident, Strickler continued to harass her by saying derogatory things about her to other crew chiefs.

Mims alleges that Strickler also discriminated against her when he moved a white employee who also worked in the wash section to work on wheels before she was moved to work on wheels. She claims that the Caucasian employee was moved under the pretext that he had his own tools, whereas she and other employees were able to use American's tools in the tool crib.

Mims claims that American discriminated against her when crew chief Don Sperry told her that her shorts were too short, but he allowed Caucasian employees to wear shorts that were too short or that did not have the American logo on them.

Mims also testified that American discriminated against her when Carl Black asked the individuals at her domino table, which included Williams, Ford, Hall, and Kenny Dubois, a white employee, to go back to work after break time. Plaintiffs contend that Black did not tell the Caucasian employees at other tables to go back to work at the end of break time and instead, he sat down with the Caucasian employees who continued playing dominoes.

Williams was laid off from American in April 2003 and still holds recall rights to go back to American if American begins hiring again. She was not denied promotions, pay increases or bonuses.

Mims was laid off from American in 2003 pursuant to a reduction in force and has not received a notice of a right for recall. When she was laid off, she decided not to use her seniority to "bump" into another position.[3] Mims testified that exercising her right to bump into another

_____

[3]     In her response brief, Mims claims that she was informed at the time of the layoff that she did not have enough seniority to "bump" into another position. However, this assertion has no other evidentiary support and contradicts her deposition testimony.

16

position would have meant a move to Dallas.  Although she initially testified that she never voluntarily left her job at American and would go back to work there if a recall were issued, she did not want to move to Dallas, and she agreed that, at least in the sense that she did not exercise her right to bump into another position, leaving the company at the time of the layoff was "voluntary."

Mims testified that she believed crew chief Misenhelter was the only person who tried to inflict emotional distress on her, although she reported his discriminatory behavior to her supervisors, a union steward, and a person who worked in human resources at American, and none of her complaints led to a change in Misenhelter's behavior.  Misenhelter upset Mims by " birddogging, watching [her and Williams] with his watch, following [them] to the tool crib and stuff like that" as well as calling her "girly."  Mims MSJ, Dkt. # 28, App. Tab A (Mims Depo.) at 164:18-165:4.  She testified that she was stressed at work because of how Misenhelter treated her, although later she affied that she developed high blood pressure, an irregular heartbeat, and migraine headaches, none of which she had experienced before she worked at Dock 1B, and all of which went away after she left Dock 1B.  Mims never sought counseling for the stress that she felt while working at Dock 1B.[4]

Williams testified that Misenhelter inflicted emotional distress on her by telling her and Mims that they "might as well forget about transferring out of his shop because the only way we were going to get out of there is to quit working for American Airlines."  Williams MSJ, Dkt. # 30, App. Tab A (Williams Depo.) at 112:22 - 113:4.  She also testified that "he let the other guys get away with whatever they want to do," that she and Mims "got the worst assignments," and that "I

---

[4] After her deposition, Mims affied that she was afraid Misenhelter would physically harm her. Resp. Br., Dkt. # 69, App. Tab I, ¶ 6.

guess he was looking for us to just quit because he talked to us just like we were some dogs." Id. at 113:20 - 25.   Williams testified that she experienced mental stress that caused her to have stomach problems and diarrhea as a result of Misenhelter's behavior, and she treated her stomach problems with over-the-counter medication.  On a couple of occasions, she may have missed work because of the diarrhea.  She also experienced depression, but she did not seek professional counseling through a psychiatrist or a psychologist because she could not afford it.

D.      **The Millenium Letter**

Plaintiffs claim that they were all aware of a document which circulated at American in 1999 known as the "Millenium Letter."  The three-page, anonymously handwritten letter contains racially offensive language and encourages "the white race to take control of our country, our company, our future."  Resp. Br., Dkt. # 69, App. Tab G, at 1.  The letter includes numerous racial epithets and threats directed toward African-Americans.  American claims that, immediately after the document surfaced in December 1999, the company initiated a large-scale investigation and enlisted the help of the Federal Bureau of Investigation ("FBI").  American submits that neither American nor the FBI were able to identify the author of the letter even after extensive efforts to do so, including a handwriting and finger-printing analysis.  Plaintiff Hall testified that he saw the letter sitting on the table of the Shop, but he admitted that the letter was not sent to him, that he did not report the letter to a manager or supervisor, that the letter was anonymously left on the table, and that it could have been placed there by an African American employee.

Almost a year after the plaintiffs' depositions, Mims, Williams and Hall each signed an affidavit in support of their response to American's motions for summary judgment against them. Plaintiffs Mims and Williams state that there was a general feeling of racial tension in Dock 1B and

that they were aware of that tension.  They also claim also to have seen white nooses in hangar rafters and understood them to be a threat to their safety and to the safety of black employees in general.  Williams, in particular, affied that the nooses remained hanging after complaints were made about them, and that coworkers told her the Klan was involved and there on base.  She was afraid to go to her vehicle after dark.  Mims also stated that she was "super careful" every time she went to her car in the company parking lot.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the

plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

### A.   The Railway Labor Act

American initially argues that plaintiffs' allegations of discrimination with regard to break periods and job assignments are preempted by the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151-163, 181-188.  The RLA was enacted in 1926 and extended to airlines in 1936.  It provides a comprehensive framework for resolution of "major" and "minor" disputes in the covered industries. Major disputes relate to "the formation of collective bargaining agreements or efforts to secure them," Ertle v. Continental Airlines, Inc., 136 F.3d 690, 693 (10th Cir. 1998) (quoting Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 252 (1994)), whereas minor disputes "involve the interpretation of a collective bargaining agreement, the existence of which is not in dispute." Barnett v. United Air Lines, Inc., 738 F.2d 358, 361 (10th Cir. 1984).

Minor disputes are defined in the RLA as those "between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules or working conditions . . . ." 45 U.S.C. §§ 153(I) & 184.  The RLA subjects minor disputes to compulsory dispute resolution, i.e., binding arbitration before an adjustment board whose award is enforceable in the district courts.  See 45

U.S.C. §§ 153(i)(m)(p) & 184. Since this remedy is mandatory and exclusive for minor disputes, federal courts generally lack jurisdiction to hear them. Davies v. American Airlines, Inc., 971 F.2d 463, 465 (10th Cir. 1992); see McAlester v. United Air Lines, Inc., 851 F.2d 1249, 1252 (10th Cir. 1988). However, the Supreme Court has explained that the RLA preempts federal and state employment claims only when resolution of the claims would require interpretation or application of a CBA. Norris, 512 U.S. at 260, 262; Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 405-06 (1988); see Fry v. Airline Pilots Ass'n Intern., 88 F.3d 831, 836 (10th Cir. 1996); Davies, 971 F.2d at 468.

The Court is not persuaded that plaintiffs' claims are the type of minor disputes contemplated by the RLA because it does not require interpretation or application of the CBA. Plaintiffs are not alleging that American breached its obligations under the CBA; they are alleging race discrimination under Title VII. Even if plaintiffs' claims could be characterized as derivative of rights which are created and regulated by the CBA, as American argues, plaintiffs' Title VII claims are not preempted by the RLA. Indeed, plaintiffs could pursue both claims at the same time. Alexander v. Gardner-Denver Co., 415 U.S. 36, 60-61 (1974). The United States Supreme Court has explained:

> In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective-bargaining agreement. By contrast, in filing a lawsuit under Title VII, an employee asserts independent statutory rights accorded by Congress. The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence.

Id. at 49-50. Moreover, "Title VII's strictures are absolute and represent a congressional command that each employee be free from discriminatory practices. Of necessity, the rights conferred [by Title VII] can form no part of the collective-bargaining process since waiver of these rights would defeat the paramount congressional purpose behind Title VII." Id. at 51. The Tenth Circuit has

21

explicitly held that the RLA does not repeal or preempt similar claims under § 1981.  McAlester,

851 F.2d at 1255.  Plaintiffs' claims are not preempted by the RLA.

**B.      Disparate Treatment**

Title VII provides, in relevant part:  "It shall be an unlawful employment practice for an

employer . . . to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race, color, religion, sex or

national origin . . . ." 42 U.S.C. § 2000e-2(a)(1).  To prevail under a disparate treatment theory, "a

plaintiff must show, through either direct or indirect evidence, that the discrimination complained

of was intentional." Maldonado v. City of Altus, 433 F.3d 1294, 1307 (10th Cir. 2006) (quoting

EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1191 (10th Cir. 2000)).  Disparate

treatment claims may be established by either direct or indirect evidence.  E.g., Kendrick v. Penske

Transp. Servs., Inc., 220 F.3d 1220, 1225 (10th Cir. 2000)[5]; Perry v. Woodward, 199 F.3d 1126,

1134 (10th Cir. 1999).  Examples of direct evidence include "oral or written statements on the part

of a defendant showing a discriminatory motivation," and indirect evidence is equated with

circumstantial evidence.  Kendrick, 220 F.3d at 1225.  Circumstantial evidence "require[s] the trier

of fact to infer that discrimination was a motivating cause of an employment decision, . . ." EEOC

v. Wiltel, Inc., 81 F.3d 1508, 1514 (10th Cir. 1996).

There is no direct evidence in this case to establish plaintiffs' disparate treatment claims.

Even if the Court's finding in this regard were incorrect, however, plaintiffs have not established

---

[5]      Although the Kendrick plaintiff alleged a violation of 42 U.S.C. § 1981, "in
[disparate-treatment] discrimination suits, the elements of a plaintiff's case are the same . .
. whether that case is brought under §§ 1981 or 1983 or Title VII." Maldonado, 433 F.3d
at 1307 (quoting Drake v. City of Fort Collins, 927 F.2d 1156, 1162 (10th Cir.1991)).

their claims by circumstantial evidence under the burden-shifting analysis set forth in <u>McDonnell</u> <u>Douglas Corp v. Green</u>, 411 U.S. 792 (1973), which is applicable to Title VII claims.  Under the <u>McDonnell-Douglas</u> framework, a plaintiff must first make a <u>prima facie</u> showing of discrimination.  Once the plaintiff establishes a <u>prima facie</u> case, a presumption of discrimination arises and the defendant has the burden to produce a "legitimate, nondiscriminatory reason" for its actions.  <u>E.g.</u>, <u>McCowan v. All-Star Maintenance, Inc.</u>, 273 F.3d 917, 922 (10th Cir. 2001).  If the defendant does so, the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely a pretext for discrimination.  <u>Id.</u>

The elements of a disparate treatment claim have been articulated in different ways under Title VII and, like all claims subject to the <u>McDonnell-Douglas</u> analysis, may vary "depending on the context of the claim and the nature of adverse employment action alleged." <u>Kendrick</u>, 220 F.3d at 1227.  At least one Tenth Circuit case articulates the prima facie case for discrimination as requiring proof of "(1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees."  <u>Orr v. City of Albuquerque</u>, 417 F.3d 1144, 1149 (10th Cir. 2005) (citation omitted).  Numerous courts set forth another element, <u>i.e.</u>, that the plaintiff was qualified for the position or that the plaintiff was performing his or her job satisfactorily. <u>E.g.</u>, <u>Sandoval v. City of Boulder, Colo.</u>, 388 F.3d 1312, 1325 (10th Cir. 2004); <u>Ortiz</u> <u>v. Norton</u>, 254 F.3d 889, 894 (10th Cir. 2001); <u>Goodwin v. GM Corp.</u>, 275 F.3d 1005, 1012 (10th Cir. 2002); <u>Horizon/CMS Healthcare Corp.</u>, 220 F.3d at 1192; <u>Kendrick</u>, 220 F.3d at 1226.  The Tenth Circuit has recognized that: "[c]ollapsing the four-part prima facie case of McDonnell Douglas into a three-part test may occasionally be helpful when addressing discrimination claims that either do not fall into any of the traditional categories (e.g., hiring or discharge) or present

23

unusual circumstances." Kendrick, 220 F.3d at 1227 n. 6.).  In this case, it does not matter whether the Court analyzes plaintiffs' claims under a three-part or four-part test because no genuine issue of fact exists as to whether plaintiffs suffered an adverse employment action, which is an element of both tests.           The Tenth Circuit has stated:

> Because of the remedial nature of Title VII lawsuits, we broadly define adverse employment action. Jeffries v. Kansas, 147 F.3d 1220, 1232 (10th Cir. 1998). We have stated that adverse employment actions "constitute[ ] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Stinnett v. Safeway, Inc., 337 F.3d 1213, 1217 (10th Cir. 2003) (internal quotation and citation omitted). We have also recognized that monetary losses take a variety of forms including shifts in compensation or benefits. See Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th Cir. 1998).

Orr, 417 F.3d at 1150.  "'[A] mere inconvenience or an alteration of job responsibilities' is not an adverse employment action."  Hillig v. Rumsfeld, 381 F.3d 1028, 1031 (10th Cir. 2004) (citing Berry v. Stevinson Chevrolet, 74 F.3d 980, 986-87 (10th Cir. 1996)).

Plaintiffs allege that they have suffered adverse employment actions due to their crew chief's or supervisor's criticism and comparison of their work, close supervision and monitoring of their work, and assignment of undesirable tasks within their job descriptions.  Numerous courts have held these types of allegations insufficient to create a genuine issue of material fact.  Criticism and comparison of an employee's work do not constitute "adverse employment actions" under Title VII. See, e.g., Wells v. Colorado Dept. of Transp., 325 F.3d 1205, 1214 (10th Cir. 2003).  Similarly, close supervision and monitoring of an employee's work do not meet the criteria for an adverse employment action.  See, e.g., Allen v. Michigan Dept. of Corr., 165 F.3d 405, 409-10 (6th Cir. 1999); Kennedy v. General Motors Corp., 226 F. Supp. 2d 1257, 1267-68 (D. Kan. 2002).  Although reassignment with significantly different job responsibilities can indicate an adverse action, see

Wells, 325 F.3d at 1215-16, undesirable or difficult job assignments within an employee's work description generally fail to constitute adverse employment actions.  See Griffin v. Potter, 356 F.3d 824, 829 (7th Cir. 2004); Tuggle v. Mangan, 348 F.3d 714, 721-22 (8th Cir. 2003); Southard v. Tex. Bd. of Crim. Justice, 114 F.3d 539, 555 (5th Cir. 1997); Montandon v. Farmland Indus. Inc., 116 F.3d 355, 359 (8th Cir. 1997); Kennedy, 226 F. Supp. 2d at 1266.

In particular, supervisory actions taken in accordance with job restrictions do not affect an employees' status.  See, e.g., Rabinovitz v. Pena, 89 F.3d 482, 489 (7th Cir. 1996) (lower performance rating and workplace restrictions).  Supervisor Black's comment that he liked "telling you all to go to work first" could be construed as having racial undertones, but plaintiffs have not shown that it affected their job status.  Derogatory comments or rude behavior, without more, do not constitute adverse employment actions.  See, e.g., Amro v. Boeing Co., 232 F.3d 790, 795, 799 (10th Cir. 2000); Heno v. Sprint/United Mgmt. Co., 208 F.3d 847, 857-58 (10th Cir. 2000); Sanchez, 164 F.3d at 533.  Plaintiffs' crew chiefs, unlike their supervisors, had no authority to hire, fire, promote, or discipline them.  Yet, even if their activities could be considered managerial or supervisory, none of the crew chiefs' alleged discriminatory actions affected plaintiffs' job status.

The claim by Mims and Williams that Misenhelter refused to train them may have affected their job performance, but not their job status.  Denial of training does not constitute an adverse employment action covered by Title VII unless it somehow affects the aggrieved employee's job status or benefits.  See Shackelford v. Deloitte & Touche, LLP, 190 F.3d 398, 406-07 (5th Cir. 1999); Letares v. Ashcroft, 302 F. Supp. 2d 1092, 1096-97 (D. Neb. 2004); Ogden v. Keystone Residence, 226 F. Supp. 2d 588, 602-03 (M.D. Pa. 2002); Richardson v. Blue Cross/ Blue Shield of Kansas, Inc., 196 F. Supp. 2d 1174, 1184 (D. Kan. 2002); Chika v. Planning Research Corp., 179

F. Supp. 2d 575, 584-85 (D. Md. 2002).[6]  Mims and Williams were reassigned jobs with different responsibilities when they transferred from Dock 1B to the Shop, but Mims and Williams are not alleging that the transfers were discriminatory.  In fact, they requested the transfers, and did not allege any significant change in their salaries or benefits as a result.

Taken in the light most favorable to the movants, even if the actions of plaintiffs' crew chiefs and supervisors could be viewed by the trier of fact as racist and even sexist, a reasonable juror could not find that plaintiffs suffered an "adverse employment action" as that term is defined in the law.  Plaintiffs have not established a prima facie case of discrimination based on a basic disparate treatment theory.  The issue remains whether plaintiffs have established a prima facie case of discrimination based on a hostile work environment theory.

C.     **Hostile Work Environment**

The Supreme Court has "broadly read Title VII 'to strike at the entire spectrum of disparate treatment of men and women in employment which includes requiring people to work in a discriminatorily hostile or abusive work environment.'" McCowan, 273 F.3d at 922 (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).  "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Id. (quoting Harris, 510 U.S. at 21)). The Court is to "judge that atmosphere both

---

[6]     The Court is aware of Pafford v. Herman, 148 F.3d 658, 667-68 (7th Cir. 1998), in which the Court held that the materiality of the plaintiff's training to promotions was not a proper prima facie element in a failure to train case, but the Pafford court proceeded to analyze that plaintiff's claim in terms of the employer's policy for promotion and her qualifications and training in comparison to employees who were promoted.

objectively and subjectively" . . . [and] look at all the circumstances 'from the perspective of a reasonable person in the plaintiff's position.'" McCowan, 273 F.3d at 923 (citations omitted).

The Tenth Circuit has stated that, "[t]o survive summary judgment on a racially hostile work environment claim, a plaintiff must show 'that, under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment,  and (2) the harassment was racial or stemmed from racial animus.'" Chavez v. New Mexico, 397 F.3d 826, 831-32 (10th Cir. 2005) (quoting Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir. 1994)).  There is no "mathematically precise test" to determine whether an environment is hostile or abusive, but some factors that may be considered include:  "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23.  Actual psychological harm, while relevant, is not required.  Id.

Plaintiffs' allegations include a wide variety of isolated incidents as well as continuing conduct.  Ford and Hall reported one comment by crew chief Seagroves that was critical of their work performance.  Both plaintiffs thought that being compared to high performance employee Mike Miller was discriminatory.  They alleged that they were threatened with being put in an area that was not air-conditioned.  They believed that having a supervisor or crew chief count their brake keys or make an urgent request for high production was discriminatory.  Ford objected to assignments in the tear down area of the Shop, or to being assigned to work on heavier wheels than the wheels to which white females were assigned.  Hall objected to having to look for additional work after he finished an assignment, whereas others were not required to do so.  Ford and Hall were upset when the next shift crew did not mount the wheels built by Ford and Hall.

All of the plaintiffs experienced the requests by supervisors to return to work at the end of break period while white employees were allowed to continue playing dominoes. Mims alleged that four additional incidents in the Shop were discriminatory: when a crew chief Strickler sent Williams into the bathroom to get her, when he moved a white person to the "wash" area before he moved Mims to that area, and when he commented that her shorts were too short. Both Mims and Williams alleged that crew chief Misenhelter discriminated against them not only because they were black, but because they were women. They complain that he told them they would not be working long in Dock 1B, and that he later told them they would not be able to leave Dock 1B unless they left American. They were offended when they had to wait 45 days before they had a locker. They alleged that having to go to work immediately while the white, male workers were allowed to loiter before work was also discriminatory conduct. They testified to other examples of alleged discrimination as the "birddogging" they experienced when their breaks and retrieval of tools were timed; being called "girly" or a name other than their given name; being criticized and reprimanded for poor work; and being giving difficult and dangerous assignments. Perhaps the most egregious conduct by their crew chief in Dock 1B was his alleged failure to train them, and his alleged demand that they climb on a moving airplane to paint.

Using the Harris factors as a guide, the alleged discriminatory conduct was frequent, but a reasonable person in the plaintiffs' position could not adjudge any of the incidents as severe. Misenhelter's prankish demand that Mims and/or Williams climb on a plane about to be moved and Strickler's demand that Williams search in the bathroom for Mims could be characterized as physically threatening or humiliating. Misenhelter's calling Mims and Williams "girlie" could be deemed an offensive utterance, at least in sexual harassment cases, and his failure to train them

could be seen as unreasonable interference with their work performance.  All of this conduct, if taken as true and in the light most favorable to plaintiffs, is indicative of a workplace permeated with discriminatory intimidation, ridicule, and insult, but the issue is whether that conduct is sufficiently severe or pervasive enough *to alter the conditions of the victim's employment* and create an abusive working environment.

Judging the atmosphere in Dock 1B and the Shop both objectively and subjectively, and looking at all the circumstances, the Court finds that it was not, as none of the plaintiffs testified that the alleged discriminatory conduct altered the conditions of their employment.  Plaintiffs were never physically harassed, never subjected to offensive posters or cartoons, never written up, never given an "advisory," never called into a disciplinary meeting, never docked any pay, never denied any shift changes, and, other than Misenhelter's use of the sexist term "girlie," never called any names.  There is no evidence that they were ever denied promotions, pay increases or bonuses.  While these actions are not inclusive of the conduct that could alter the conditions of employment, the absence of this type of conduct demonstrates plaintiffs' inability to prove they experienced hostile work environment discrimination at American in violation of Title VII.

Apparently to bolster their claim that the harassment was racial or stemmed from racial animus, plaintiffs argue that the Court must evaluate the alleged discriminatory conduct they experienced in light of the Millenium Letter, white nooses hanging from hangar rafters, and rumors of the Ku Klux Klan's influence at American.  The Tenth Circuit has "repeatedly stated that in a case alleging a violation of Title VII and the presence of a racially hostile work environment, the existence of [racial] harassment must be determined in light of the record as a whole, and the trier of fact must examine the totality of the circumstances, including the context in which the alleged

incidents occurred.   McCowan, 273 F.3d at 925 (citations and internal quotations omitted). Plaintiffs point out that "[f]acially neutral abusive conduct may support a finding of [racial] animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly [racially-discriminatory] conduct."   Chavez, 397 F.3d at 833 (quoting O'Shea v. Yellow Technology Servs., Inc, 185 F.3d 1093, 1097(10th Cir. 1999) (addressing alleged gender discrimination)).

Plaintiffs' contextual arguments fail because the evidence shows that plaintiffs did not consider the Millennium Letter, the white nooses, and the Ku Klux Klan rumors significant to their allegations of discriminatory conduct in Dock 1B and the Shop.  The charges filing by plaintiffs with the Equal Employment Opportunity Commission ("EEOC") fail to include any reference to the Millennium Letter, the white nooses, or rumors of the Ku Klux Klan.[7]  Each of the plaintiffs indicated in their charges that the alleged discrimination occurred after March or April 2002 – after they were exposed to the letter, the nooses, and the rumors.  Further, references to the letter, the nooses and the rumors are notably absent or insignificant in plaintiffs' notes, pleadings and deposition testimony prior to their response brief to the motions for summary judgment.

In the affidavits plaintiffs submitted with their responses, three of the plaintiffs testified to their exposure to the letter, the nooses, or the rumors.  Hall claimed that the letter "affected me big time" by making his job stressful and making him angry, hurt, sad, and fearful, paranoid, and nervous or anxious. Resp. Br., Dkt. # 69, Tab K, ¶ 3.  Mims and Williams claimed to have seen the

---

[7]       American argues that plaintiffs failed to exhaust their administrative remedies with regard to the allegations relating to the Millennium Letter, the white nooses and the Klan rumors, but plaintiffs are not alleging that American somehow violated Title VII by not acting to rid the workplace of these elements.

nooses, but did not indicate when they saw them.  They claim that the nooses made them fearful. Id., Tab I, ¶ 8; Tab J, ¶¶ 8, 9.  Only Williams affied that she heard rumors about the Klan's involvement with the hanging of the nooses.  Id., Tab J., ¶ 7.  The Court views these affidavits as belated efforts to create a racially-charged context in which the discriminatory conduct occurred. They do not alter the Court's view of the evidence, which shows that the discriminatory intimidation, ridicule, and insult experienced by the plaintiffs was not sufficiently severe or pervasive to alter the term, conditions, or privileges of these victims' employment.

As American points out, the Tenth Circuit has not found hostile work environments in contexts which are far more racially charged than the context alleged by plaintiffs.  See, e.g. Witt v. Roadway Express, 136 F.3d 1424, 1428-29 (10th Cir. 1998) (where the plaintiff complained about an assignment and a coordinator said "F--- that ------, he don't have no rights," and where a supervisor called his home and asked "Where's this ------ at?"); Bolden v. PRC, Inc., 43 F.3d 545, 549 (10th Cir. 1994) (where a co-worker warned plaintiff that plaintiff "better be careful because we know people in the Ku Klux Klan," and used terms such as "honky" and "------"); Hicks v. Gates Rubber Co., 833 F.2d 1406, 1409 (10th Cir. 1987) (where plaintiff alleged that her supervisor referred to African-American employees as "------" and "coons"); cf. Ford v. West, 222 F.3d 767, 774-75 (10th Cir. 2000) (no employer liability where the plaintiff observed a noose hanging from the ceiling, alleged that his supervisor and a co-worker called him a "cry baby" and discussed "getting rid" of his "black ass," and alleged that a supervisor and co-worker used ethnic slurs and threats).  The acts of plaintiffs' supervisors and crew chiefs at American, while not commendable, do not constitute racial discrimination in violation of Title VII, given that their acts did not alter the

plaintiffs' working conditions or cause them to suffer adverse employment actions as defined by the statute and the case law interpreting it.[8]

**D.      Intentional Infliction of Emotional Distress**

Under Oklahoma law, to recover damages for intentional infliction of emotional distress, a plaintiff must prove that:  "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the emotional distress was severe." Estate of Trentadue ex. rel. Aguilar v. United States, 397 F.3d 840, 855-56 (10th Cir. 2005).  The Trentadue court explained each of these elements in detail.  The term "'recklessness' in the first element includes actions that are in 'deliberate disregard of a high degree of probability that the emotional distress will follow.'" Id. at 856 (quoting  Restatement (Second) of Torts § 46 cmt. i).

The plaintiffs' crew chiefs, supervisors and investigators may have acted intentionally or recklessly.  However, a rational finder of fact could not find that the conduct of those crew chiefs, supervisors and investigators at American was extreme and outrageous.  The Trentadue court elaborated on the second element as follows:

> The second element of the tort requires proof that the tortfeasor's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Kraszewski v. Baptist Med. Ctr. of Okla., Inc., 916 P.2d 241, 248 n. 25 (Okla. 1996) (quoting Restatement (Second) of Torts § 46 cmt. d). Generally, the case is one where "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to

---

[8]      Because the plaintiffs have not made out a prima facie case of race discrimination under the alleged theories of disparate treatment or hostile work environment, the Court does not address whether defendants have articulated a legitimate, non-discriminatory reason for their adverse employment actions or whether plaintiffs have shown that the reason articulated by American is pretextual.

exclaim, 'Outrageous!'" Id. at 249 n. 25.   In addition, whether the tortfeasor's conduct was extreme and outrageous must be considered in the setting in which the conduct occurred. Eddy v. Brown, 715 P.2d 74, 77 (Okla. 1986) (holding that nature of the conduct should not be considered in a sterile setting, detached from the milieu in which it took place); see also Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1559 (10th Cir. 1995) (applying Oklahoma law and noting that court must focus on the totality of the circumstances).

397 F.3d at 856.

Ford and Hall testified that their crew chief and supervisors criticized their work performance, compared them with a high performer, threatened to make them work in an area that was not air-conditioned, closely monitored their work performance, assigned them to more difficult or unpleasant work, did not require the next shift to mount the wheels they built, and asked them to go back to work at the end of her break period.  None of these activities can be deemed extreme and outrageous, even if their superiors treated white employees better, as they allege.  Similarly, Mims' superiors in the Shop may have acted disrespectfully when she took a bathroom break, when one of them moved a white person to the wash area before he moved her, and when another supervisor commented on the length of her shorts.  Such conduct cannot be regarded as beyond all possible bounds of decency, atrocious, and utterly intolerable in a civilized community.

Crew chief Misenhelter's name-calling and birddogging of Mims and Williams were oppressive.  If he discouraged them from transferring out of his shop, allowed white male employees more discretion with their time, gave Mims and Williams the worst assignments, and generally talked down to them, his actions deserve condemnation, but they would not cause an average member of the community to arouse his resentment against Misenhelter and lead him to exclaim, "Outrageous!"  Misenhelter's failure to train Mims and Williams was unwise, and his demand that they climb on a moving plane was a foolish prank, but none of these actions constitute extreme and

33

outrageous conduct.  The tort of intentional infliction of emotional distress does not extend "to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Eddy v. Brown, 715 P.2d 74, 77 (Okla. 1986) (quoting Restatement of Torts (Second), § 46, comment d).

The Trentadue court set forth the third and fourth elements as follows.  "The third element of an emotional distress claim requires proof that the tortfeasor's conduct caused the plaintiff's emotional distress."  Id. (citing Computer Publ'n, Inc. v. Welton, 49 P.3d 732, 735 (Okla. 2002)).

> Finally, the fourth element requires proof that the plaintiff's emotional distress was "so severe that no reasonable [person] could be expected to endure it." Computer Publ'n, 49 P.3d at 736 (quoting Breeden [v. League Services Corp.], 575 P.2d [1374,] 1377 n. 6 [Okla. 1978]). While emotional distress includes "all highly unpleasant mental reactions," it is only where the emotional distress is extreme that liability arises. Miller v. Miller, 956 P.2d 887, 901 n. 44 (Okla.1998). "The intensity and the duration of the distress are factors to be considered in determining its severity." Breeden, 575 P.2d at 1378 n. 6 (quoting Restatement (Second) of Torts § 46 cmt. j). Moreover, although severe distress must be proved, "in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed." Id.

Trentadue, 397 F.3d at 856.

Although the conduct of certain crew chiefs, supervisors and investigators at American may have caused some emotional distress for Ford, Mims and Williams, it cannot be said that the distress they experienced was so severe that no reasonable person could be expected to endure it.  Ford stated that she had an emotional spell and one anxiety attack, but she did not seek counseling of any kind during the course of the events she described.  Mims affied, belatedly, that she developed high blood pressure, an irregular heartbeat, and migraine headaches, none of which she had experienced before she worked at Dock 1B, and all of which went away after she left Dock 1B.  However, Mims never sought counseling for the stress that she felt while working at Dock 1B.  Williams testified that she experienced mental stress that caused her to have stomach problems and diarrhea as a result

of Misenhelter's behavior, and she treated her stomach problems with over-the-counter medication. On a couple of occasions, she may have missed work because of the diarrhea. She also experienced depression, but she did not seek professional counseling through a psychiatrist or a psychologist because she could not afford it. A trier of fact could not reasonably find that the emotional distress experienced by these plaintiffs was severe or extreme. Accordingly, the Court finds that American is entitled to judgment as a matter of law on plaintiffs' claims for intentional infliction of emotional distress.

**V.**

IT IS THEREFORE ORDERED that the Motion for Summary Judgment Against Plaintiff Hall (Dkt. # 27), the Motion for Summary Judgment Against Plaintiff Mims (Dkt. # 28), the Motion for Summary Judgment Against Plaintiff Ford (Dkt. # 29), and the Motion for Summary Judgment Against Plaintiff Williams (Dkt. #30) are hereby **granted**.

Dated this 10th day of August, 2006.

TERENCE KERN
UNITED STATES DISTRICT JUDGE